JOHN P. STOCKTON, attorney-general of New Jersey

v.

THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, THE PORT READING RAILROAD COMPANY and THE PHILADELPHIA AND READING RAILROAD COMPANY.

1. A corporation, created by statute, possesses no rights and can exercise no powers which are not expressly given or to be necessarily implied.

2. Such a corporation cannot lease or dispose of any franchise needful in the performance of its obligations to the state, without legislative consent.

3. The act of March 11th, 1880, which amends the seventeenth section of the act entitled "An act to authorize the formation of railroad corporations and to regulate the same" (*Rev. p. 930*), is free from constitutional infirmity in its title and is sufficiently broad in its terms to confer power upon railroad corporations chartered by special law.

Stockton *v.* Central R. R. Co.

4. The act of May 2d, 1885, entitled "An act respecting the leasing of railroads," is constitutional.

5. Equity looks at the substance, and will disregard names and penetrate disguises of form, to discover and deal with it.

6. Where a corporate excess of power tends to the public injury or to defeat public policy, it may be restrained in equity at the suit of the attorney-general.

7. A railroad company of this state leased its franchises and roads to a railway corporation of another state. The lease was not only unauthorized, but was expressly forbidden by law. Its effect was to combine coal producers and carriers and to partially destroy competition in the production and sale of anthracite coal, a staple commodity of the state.—*Held*, to be a corporate excess of power which tends to monopoly and the public injury.

On order to show cause why injunction shall not issue, heard upon information, exhibits and affidavits, answers of the defendants, affidavits and limited proofs taken under order of the chancellor, in conformity with the provisions of Rule 121.

The object of the information is to have a certain indenture of lease made between the Central Railroad Company of New Jersey and the Port Reading Railroad Company, and also a certain tripartite agreement between the Central Railroad Company of New Jersey, the Port Reading Railroad Company and the Philadelphia and Reading Railroad Company, decreed to be *ultra vires* and therefore void; and void also upon the ground of public policy, in that they tend to create a monopoly of the anthracite coal trade within the state, by stifling competition between the contracting corporations, and thereby to increase the price of anthracite coal to the inhabitants of the state. And to effectually destroy the effect of such lease and agreement, under which the property and franchises of the Central Railroad Company of New Jersey have already been delivered to the Port Reading Railroad Company, it seeks a mandatory decree which shall enjoin the Port Reading Railroad Company to surrender and return to the Central Railroad Company the corporate franchises and property, and a restrictive decree which shall perpetually restrain the Port Reading Railroad Company from hereafter controlling and intermeddling with such franchises and property, and the three corporate defendants, from all future combinations to do that

Stockton v. Central R. R. Co.

which will arbitrarily increase, or tend to increase, the price of coal to the inhabitants of New Jersey.

The purpose of the present application is to secure an injunction that will, temporarily, at least, effect all these ends.

The Central Railroad Company of New Jersey was incorporated by special act of the legislature of this state entitled "An act to incorporate the Somerville and Easton Railroad Company," approved February 26th, 1847. Before then, on the 9th of February, 1831, the Elizabethtown and Somerville Railroad Company had been incorporated, with power to construct a railroad from Elizabethtown to Somerville. The Somerville and Easton railroad effected a continuation of railroad communication from Somerville to Phillipsburg, on the Delaware river, opposite Easton, Pennsylvania. By a supplement to the charter of the Somerville and Easton Railroad Company, approved February 22d, 1849, that company was authorized to purchase the Elizabethtown and Somerville railroad, and it was provided that the two railroads should be controlled by the charter of the Somerville and Easton Railroad Company, and that the controlling company should thereafter be called "The Central Railroad Company of New Jersey." The purchase was consummated on the 1st day of April, 1849. In 1860, by another legislative act, the Central Railroad Company was authorized to extend its road to the New York bay at or south of Jersey City. From time to time, by legislative authority, the capital of the company was increased, until now the stock outstanding amounts, in round figures, to about $22,500,000 of an authorized capital of $30,000,000. Besides this large capital, the company has an indebtedness of upwards of $45,000,000. It owns, leases or controls more than forty tributary railroads. It has a large and prosperous business and earns a respectable dividend upon its capital stock beyond the payment of the interest upon its indebtedness and its other fixed charges. Its assets exceed in value its outstanding capital stock and its indebtedness, which together aggregate, as has been indicated, more than $67,000,000. In 1871 it leased the Lehigh and Susquehanna railroad, running from Wilkesbarre to Easton, in Pennsylvania, from its owner, the Lehigh

Coal and Navigation Company, a corporation of Pennsylvania, and also purchased the rolling stock and other equipment of that road.    This leased railroad extends through a valuable portion of the anthracite coal region in Pennsylvania.

About the same time the Central Railroad Company also invested in coal lands, by organizing, or causing to be organized, the Lehigh and Wilkesbarre Coal Company, and becoming the owner of all, or substantially all, of its capital stock.    This coal company issued bonds which the Central Railroad Company guaranteed.    In virtue of its interests in the anthracite coal region and the advantageous location of its roads, the Central Railroad Company has become a considerable coal carrier, not only from the mines of the company in which it is interested, but also from the mines of other miners not having railroad facilities, in and through the States of New Jersey and Pennsylvania to the New York harbor, which is the greatest distributing point for anthracite coal in the United States.

The Philadelphia and Reading Railroad Company, a corporation of the State of Pennsylvania, is also possessed of railways running into the anthracite coal region of Pennsylvania and is an extensive coal carrier.   Save a few shares, used to qualify directors, it is the owner of the entire capital stock of the Reading Coal and Iron Company, which, in the year 1891, produced from its colliers eight million two hundred and three thousand four hundred and sixty-five tons of coal, being one-fifth of the total product of anthracite coal from Pennsylvania during that year. Along the lines of the Philadelphia and Reading's railroads there are also other coal miners who find a market for their coal by the means of transportation it affords.   The capital stock of the Philadelphia and Reading Railroad Company, at par, amounts to about $40,000,000, and its indebtedness to more than $160,000,000, all of which is balanced by assets alleged to be of equal value. The annual report of the directors of this company for the year ending November 30th, 1891, referring to the coal lands controlled by that company, contains this statement:

" The coal lands comprise in extent about thirty-two per cent. of the entire anthracite coal fields of the State, and, taking into account the aggregate thick-

ness of the veins on the company's lands and the greater proportionate deple-
tion of the estate in the other regions which has been going on for many years,
it must be conceded that we have at least fifty per cent. of the entire deposit
remaining unmined."

Throughout this report and reports similar, whenever the lands
of the Reading Coal and Iron Company are alluded to, they are
spoken of as the property of the Philadelphia and Reading Rail-
road Company, and that company itself, as the property of the
railroad.

It appears also that the Philadelphia and Reading Railroad
Company has become the lessee of the Lehigh Valley Railroad
Company, a corporation of the State of Pennsylvania, which, in
turn, is the lessee of the Easton and Amboy Railroad Company,
a corporation of this state, having a line of railroad from Easton,
Pennsylvania, to Perth Amboy. The Lehigh Valley Railroad
Company is a miner of coal to some extent, and possesses a rail-
road which runs through the anthracite coal region of Pennsyl-
vania and affords facilities for transportation of coal there mined,
to markets in this and adjoining states.

For several months past competition between these three
roads, in the procuration and transportation of coal, and between
each of them and the Delaware, Lackawanna and Western Rail-
road Company, the Delaware and Hudson Canal Company and
the Pennsylvania Railroad Company, each of which is possessed
of interests in the anthracite coal region and the means of trans-
portation of coal therefrom, has materially reduced the price of
coal to consumers in this state and elsewhere, to the loss of con-
siderable profit to each of the companies named, which would
not have been suffered if competition between them had not ex-
isted.

It further appears that anthracite coal is a necessity to the
people of New Jersey, being the fuel that is most abundantly and
cheaply obtainable and most universally used in their homes and
manufactories.

The Philadelphia and Reading Railroad Company operates in
this state, among other railroads, the Delaware and Bound Brook
railroad, which extends from Bound Brook to the Delaware

river at Yardleyville, a few miles above Trenton, connecting with railroads to the anthracite coal region.    It possessed and operated this road prior to the year 1890.

On the 3d of November, 1890, A. A. McLeod, I. A. Sweigard, William R. Taylor, D. Jones, Robert S. Davis and John Walker, junior, all of whom were officers or employes of the Philadelphia and Reading Railroad Company, with others, organized the Port Reading Railroad Company, under the General Railroad law of this state, designating in the certificate of incorporation its capital at $2,000,000, divided into twenty thousand shares of the value of $100 each.    The corporators named became six of its directors, with six other persons who were also connected with or friendly to the Philadelphia and Reading Railroad Company.    The real business office of the company was fixed at the office of the Philadelphia and Reading Railroad Company in the city of Philadelphia, and a nominal office, to comply with the law of this state, was maintained at Kaighn's Point ferry, in the city of Camden, belonging to the Philadelphia and Reading company.

On the same day that this railroad company was organized, Albert Foster, James K. Landers, W. H. Blodd, F. W. Stone and Charles H. Quarles, under the General Corporation law of this state, formed the Port Reading Construction Company, with a capital of $100,000, divided into two thousand shares of the value of $50 each.    The incorporators of the company were all officers or agents of the Philadelphia and Reading Railroad Company.    Forty shares of the stock, in all of the value of $2,000, were subscribed for, and with that amount of money the company commenced business.    The business office of this company was the office of the Philadelphia and Reading Railroad Company in the city of Philadelphia.

Shortly after the organization of these two companies under the general laws of New Jersey, the Port Reading Construction Company contracted with the Port Reading Railroad Company to build its railroad, from a point on the Delaware and Bound Brook railroad to a point on the Arthur Kill opposite Staten Island, a distance of twenty miles, for $1,500,000 in mortgage bonds of the Port Reading Railroad Company and all the capital

stock of the latter company, save four hundred shares which had
been subscribed for by its corporators, the proceeds of which sub-
scription were paid to the state treasurer in pursuance of the re-
quirement of the statute, that $2,000 for each mile of road to be
constructed shall be deposited with the treasurer of the state at
the time of the organization of the company.

Previous to the formation of these companies the Philadelphia
and Reading Railroad Company had purchased three hundred
acres of land at the proposed terminal of the Port Reading rail-
road upon the Arthur Kill, and, after the organization of the two
companies, this land was transferred to the Port Reading Railroad
Company.

When the contract for the construction of the Port Reading
railroad was executed, a mortgage for $1,500,000 was made by
the Port Reading Railroad Company upon its property and
franchises, and the bonds secured thereby were transferred to the
construction company, and that company thereafter immediately
commenced to procure a right of way for the railroad company
and to construct its road. The moneys required in the prosecu-
tion of the work were had by loan to the construction company
from the Philadelphia and Reading Railroad Company, and, as
well, when the bonds of the Port Reading Railroad Company
could be negotiated, from the sale of them.

In the official report by the president of the Philadelphia and
Reading Railroad Company to the stockholders of that company
for the year ending November 30th, 1890, the president says :

" In another place in this report, the lack of means of placing the product
of your mines upon the markets, and the consequent shrinkage of production
in proportion to that of competing fields, is commented upon. A marked
illustration of the necessity of providing additional facilities for the distributing
of anthracite coal in New York Harbor, and all tide water points tributary
thereto, is found in the fact that at the time of writing this report there are
more than one thousand cars loaded with coal standing on the side-tracks in
Jersey City, because of the lack of dock facilities for transferring coal to
vessels, and on account of the restriction which these limitations impose upon
your traffic, the management is now obliged to transport coal from Port Rich-
mond through the Delaware River and around New York Harbor, encounter-
ing all the perils of coast navigation at this season of the year and at an ex-
pense largely in excess of all rail freights. With the view to meeting these

wants and other disabilities under which your company has labored ever since the day it opened its mines, for want of unrestricted access to the waters of New York Bay, the greatest distributing center in the country of anthracite coal, your Board has determined to promote the construction of a line of road, to be under the control of your Company, to extend from the vicinity or the terminus of the Bound Brook Railroad near Bound Brook, New Jersey, to deep water in Arthur Kill, a distance of twenty miles, at a point readily accessible to the waters of New York Bay and New England Ports by large vessels. Plans have been completed for the construction of this line, with adequate terminals for the storage and shipment of coal in quantities limited only by the demands of the market. Over three hundred acres of land have been acquired for terminal purposes, bordering on the waters of the Arthur Kill. Work will be speedily commenced and prosecuted with vigor. Conservative estimates show that the earnings of this line will be sufficient to meet all charges on its cost and leave a large surplus; it will furnish the means of supplying the markets with your proportion of the coal tonnage at all times. The advantage of the construction of this line in the increase of tonnage on nearly all other parts of the system, without regarding the increase of product of the Coal & Iron Company can scarcely be estimated, but it is certain that it will add a large increase of traffic earnings. It was anticipated that work on this line could have been commenced before this time, but it was found necessary to make several surveys in order to avoid all grade crossings of other railroads, and your Board is pleased to announce that the line adopted is of favorable grades and of almost perfect alignment, the maximum grade being only fifteen feet to the mile."

On the 12th of January, 1892, while the Port Reading Railroad Company was yet incomplete, only a few miles of a single track having been laid upon an unfinished road-bed, and it was without rolling stock of any kind, or depots, and its stock and bonds were substantially all in the hands of the Port Reading Construction Company, the Central Railroad Company of New Jersey entered into a lease with it, whereby it transferred to it for nine hundred and ninety-nine years its entire railroad, together with the right to maintain and operate more than forty tributary railroads, which it controlled by leases or through the ownership of the majority of capital stock, together with all laterals, extensions, sidings, turnouts, tracks, bridges, viaducts, culverts, rights of way, water rights and privileges, lands, shops, machinery, fixtures, depots, passenger, freight and water stations, houses, buildings, structures, improvements, tenements and hereditaments of whatever kind or description and wherever situate, appertain-

ing to the operation, maintenance and renewal of said railroads which were then laid, leased or owned by the Central Railroad Company, or which at any time thereafter, during the term of the lease, might be acquired by that company for railroad purposes; together, also, with all its ferries and rights of ferriage then belonging or thereafter to be acquired by it, and all the stationary and locomotive engines and the cars, tenders, trucks and other rolling stock of the company, tools, implements, machines and personal property of every kind and description, in use, or intended or adapted for use, upon or about the railroads and premises demised, or the business thereof, and also the rights, powers and franchises (other than the franchise of being a corporation) and all the privileges which then, or at any time thereafter during the term of the lease, might be lawfully exercised and enjoyed by it touching the premises demised, including all rights in telegraph lines upon the railroad or the several branches thereof. The Central company reserved to itself its office building in the city of New York, known as the "Central Building," and lands owned by it which are not adjacent to the railroad, or, if adjacent, not in railroad use; provided, however, if the last-mentioned lands, or any of them, should be subsequently needed by the lessee, they also would be surrendered.

. The Port Reading Railroad Company covenanted to pay to the Central Railroad Company annually enough money to enable it to pay its fixed charges and seven per cent. upon its capital stock then issued, and such capital stock as should be issued thereafter under specified circumstances, and also pay it fifty per cent. of the lessor's earnings through the instrumentalities of the railways of the Central, in excess of the fixed charges and seven per cent. upon the capital stock, up to three per cent. upon the outstanding capital stock of the Central; and also agreed to pay the taxes which should be assessed upon the capital stock and dividends of the Central, to keep the premises demised in repair, to insure the property, to save the Central harmless from all damages by reason of the operation of its road or by reason of any failure in the performance of the duties required of it, and to provide and maintain terminals, stations, repair shops and equipments, and

maintain rolling stock and tools equal to the rolling stock deliv-
ered to it, so marked as to identify them. Betterments were to
be made by the Central Railroad Company, if it pleased; it was
to have five per cent. annually upon the moneys it should pay
for the betterments, and was to be permitted to mortgage the de-
mised property to secure the repayment of moneys it should
borrow to enable it to make them. The Port Reading also
agreed to keep accounts, which should be open to the Central's
inspection, and to perform all the Central's existing contracts re-
lating to the demised premises; also to procure traffic over the
Lehigh and Susquehanna railroad to a specified amount. It
covenanted that it would not divert, nor permit the diversion,
from the Central of the Central's then traffic, or of any traffic
which should thereafter be naturally tributary to it, but that it
would foster and strive to increase traffic and the earnings of
traffic over the Central's road and the earnings of that road. It
also covenanted that individual coal miners on the line of the
Central's roads should have transportation for their coal without
discrimination against them; that cars and transportation should
be furnished to all coal miners who should be naturally tributary
to the Central's system, and that the rates charged for transpor-
tation should be as low as the rates charged, at any time, for
similar transportation by the Philadelphia and Reading Railroad
Company from the Schuylkill region. All the stocks of various
companies owned by the Central Railroad Company were, so far
as concerned corporations included within the lease, to remain
the property of the Central company and be used by it to enable
the Port Reading company to control those corporations. The
lease was not to be assigned without the Central Railroad Com-
pany's consent. It was to take effect as of January 1st, 1892,
and the right of re-entry was secured to the Central in case of
any default upon the part of the Port Reading Railroad Company
in the performance of its undertaking.

Upon the same day that this lease was executed a tripartite
agreement between the Central Railroad Company, the Port
Reading Railroad Company and the Philadelphia and Reading
Railroad Company, in which the lease just referred to was in-

corporated, was entered into. This agreement recited that the lines operated by the three railroad companies were connected in New Jersey and Pennsylvania and form continuous lines; also that the Central Railroad Company was willing to lease to the Port Reading company if the Philadelphia and Reading would guarantee the performance of the Port Reading's covenants in the proposed lease; that the Port Reading was willing to lease if the Philadelphia and Reading would insure the increase of traffic that the lease contemplated, and the Philadelphia and Reading was willing to guarantee the lease because of the advantage it would have in the terminals of the Central railroad and in the interchange of traffic with it.

And it was thereupon agreed that the lease should be executed; that the consent of the stockholders of the Central and Port Reading companies to the lease should be procured as counsel of the Philadelphia and Reading company should instruct; that possession of the demised premises should be immediately given; that the payments to be made by the Port Reading company and the covenants to be performed by it were guaranteed by the Philadelphia and Reading company; that the Philadelphia and Reading would make the payments if the Port Reading should not make them, and that it would cause the Port Reading to perform its covenants; that the Port Reading company should provide or procure, at Jersey City and in New York and Brooklyn and on the Arthur Kill, terminal facilities for the Philadelphia and Reading traffic, the Central Railroad Company having the privilege to provide such facilities, except at the Port Reading's terminal on the Arthur Kill, as betterments; that the traffic which would thereafter naturally go to the Central as its direct route should be secured to that road; that coal, naturally tributary to the Central, should go over it for as long a distance as possible; that coal, naturally tributary to the Philadelphia and Reading, which was destined to the New York harbor north of Elizabeth, should go over the Central's road, at least from Bound Brook Junction; that coal for delivery on line of the Central's road, from mines tributary to it, should go over the Central, or, in the event of its not going over the Central, that an equivalent

for the loss of the freight rates should be credited in the Central's account; that traffic on the Easton and Amboy railroad and upon other Lehigh Valley lines, destined to the Central terminals, should go over the Central, at least as far as from Roselle Junction to the terminal; that other traffic as then interchanged should be continued to be interchanged; that the Port Reading and the Philadelphia and Reading would maintain the present traffic of the Central and increase it; that the Philadelphia and Reading would put $2,000,000 of securities in trust to secure its performance of the agreement; that in case of a termination of the lease and agreement, the Central shall have an interest equal to the Reading in the Central New England and Western Railroad Company and in the Poughkeepsie Bridge Company, upon its paying to the Reading one-half its expenditure for the Reading's interest and assuming a due proportion of the obligations assumed by the Reading in securing that interest. The agreement of guarantee and assurance of traffic was to continue as long as the lease should last, and in case the lease should be forfeited the agreement should then be void. The lease was executed upon the part of the Port Reading Railroad Company by A. A. McLeod, its president, and William R. Taylor, its secretary, and the agreement of guarantee and assurance was also executed by those gentlemen as president and secretary respectively, not only of the Port Reading Railroad Company, but also the Philadelphia and Reading Railroad Company.

On the 8th of April, 1892, the board of directors of the Central Railroad Company reported to the stockholders of that company that their railroads were then being operated by the Port Reading Railroad Company. Commenting upon the advantages of the lease and agreement, this report says:

"It is intended to secure for your railroad its present traffic and its natural growth and development, and in addition, by the guarantee of common interest, the benefit of whatever traffic is controlled and influenced by the Reading system, and is naturally tributary to your road and terminals. It prevents a diversion of traffic which might otherwise have resulted from the lease of the Lehigh Valley Railroad by the Philadelphia and Reading Company.

"It is fair to expect, as the further results of this alliance with the co-operation of other large coal producing companies, greater uniformity in the

Stockton *v.* Central R. R. Co.

prices of coal, steadier employment for the laboring classes in the coal regions, the avoidance of needless and expensive competition between producers and the establishment of economies which, without undue burden to consumers, will bring to the stockholders adequate returns for their capital.

"In both the lease and traffic contracts every safeguard had been provided for the preservation and development of your property.

"The independent organization of the Central Railroad Company will be maintained to discharge its obligations directly to the stockholders and bondholders as well as to see that the provisions of the agreement are observed and the maximum rentals thereby secured."

The testimony of Mr. A. A. McLeod, who was president of both the Philadelphia and Reading and the Port Reading companies when the lease and tripartite agreements were executed, has been put in the case upon the part of the informant.

In it Mr. McLeod states, among other things, that the lease does not put it in the power of the Philadelphia and Reading road to raise or lower the price of coal without the co-operation of other coal carriers, but that it will possibly facilitate such co-operation. It would itself, he says, undoubtedly affect prices of coal at some points.

In point of fact the price of coal has risen at several places in New Jersey since the lease and agreement were made. Whether this is attributable to the lease does not distinctly appear, but it is quite clear that it is the purpose of the coal companies in which the railroads involved are interested to demand a greater price for the coal they sell.

While the facts above recited remain admitted or uncontroverted, the answers deny that the defendants, or either of them, own any coal lands, or mine or sell any coal, and also that they, acting either separately or conjointly, can fix or increase the price of anthracite coal, or create a monopoly in the business of mining or selling anthracite coal, or put an end to competition in the price or sale of coal.

The *Attorney-General* and *Mr. Frederic W. Stevens,* for the informant.

*Messrs. Benjamin Williamson, Samuel Dickson* and *R. W. De-Forrest,* for the Central Railroad Company of New Jersey.

Stockton *v.* Central R. R. Co.

*Messrs. Thomas N. McCarter, John T. Johnson* and *John R. Emery,* for the Philadelphia and Reading and Port Reading Railroad Companies.

THE CHANCELLOR.

"It is a cardinal rule of the law of corporations," said Vice-Chancellor Van Fleet, in *National Trust Co.* v. *Miller, 6 Stew. Eq. 162,* "that a corporation created by statute can exercise no power and has no rights except such as are expressly given or necessarily implied."

"It may also be considered settled," said Mr. Justice Van Syckel, in pronouncing the opinion of the court of errors and appeals in *Black* v. *Delaware and Raritan Canal Co., 9 C. E. Gr. 465,* in which a lease of railroad franchises and property for nine hundred and ninety-nine years was in question, "that a corporation cannot lease or dispose of any franchise needful in the performance of its obligations to the state, without legislative consent," and the law thus declared to be settled was reiterated by Mr. Justice Dixon, in the same court, in *Stewart* v. *The Lehigh Valley R. R. Co., 9 Vr. 513,* in this language: "It is not open to dispute that such a lease as this can be valid only if santioned by the legislature. Nor is such sanction to be implied; it must rest upon a clear expression of the legislative intention. It must be gathered, in the first place, from the words which the legislature has used upon the subject; and if those words, construed according to their usual signification, declare the purpose to authorize a lease to a foreign corporation, or to a class of corporations which include the plaintiff, we must give effect to such purpose. The court has no right to add to the words of the legislature, or to substitute other words for them, in order to widen the power conferred; nor has it any more right to strike out words or detract from their fair and ordinary meaning, for the purpose of restricting the grant. The duty of the court is one of interpretation merely." To the same effect is the holding in the United States supreme court. *Thomas* v. *West Jersey R. R. Co., 101 U. S. 71; Pennsylvania R. R. Co.* v. *St. Louis &c. R. R. Co., 118 U. S. 290; Green Bay &c. R. R. Co.* v. *Union Steamboat*

*Co., 107 U. S. 290, 298; Central Transportation Co.* v. *Pullman Co., 139 U. S. 24.*

The validity of a lease of this kind is questioned in this case, and it has not been seriously contended that the lease can be sustained if clear legislative sanction for it is not found.

It is claimed that such sanction is had in the amendment of March 11th, 1880, to the seventeenth section of the General Railroad act, entitled "An act to authorize the formation of railroad corporations and to regulate the same." *Rev. p. 930; Rev. Sup. p. 828.*

That section originally, so far as it bears upon the present question, was in this language: "And it shall be lawful for any corporation incorporated under this act, at any time during the continuance of its charter, to lease" &c.

In 1880 it was amended by having interpolated in it, after the words "under this act," the words "or under any of the laws of this state," so that the amended section is now, including the words which follow the word "lease," which remain as in the act, as follows:

"And it shall be lawful for any corporation incorporated under this act or under any of the laws of this State, at any time during the continuance of its charter to lease its roads or any part thereof to any other corporation or corporations of this or any other State, or to unite and consolidate, as well as merge, its stock, property and franchises and road with those of any other company or companies of this or any other State, or to do both, and such company or companies are hereby authorized to take such lease or to unite, consolidate as well as merge its stock, property, franchises and road, with said company or to do both, and, after such lease or consolidation, the company or companies so acquiring said stock, property, franchises and road, may use and operate such road and their own roads" &c.

It is insisted, on behalf of the attorney-general, as a matter of construction, that under the seventeenth section as it originally stood, power was conferred upon a company organized under the General Railroad law to make a lease of its road either to another company formed under that act, or to a company created by a special act of the legislature of this state, or to a foreign corporation ; that is, it might be *lessor* to a company of either of those characters, but that the law did not make it competent to take a

Stockton v. Central R. R. Co.

lease from specially incorporated or foreign companies; that is, to become the *lessee* of a company of any character other than one formed under the General Railroad law. He insists that the effect and purpose of the amended act was to render such company competent to become lessee of " any corporation incorporated under this act or any of the laws of this state;" that is, that any corporation incorporated under the general law might become lessee of the road of any company specially incorporated. In other words, his insistment, shortly stated, is, that the design of the amendment of 1880 was to complete the powers of the company formed under the General Railroad law, so that it could become either lessor or lessee of any other railroad company, but that it was not the legislative purpose thereby to extend the powers of *specially chartered railroad companies.*

He claims that such interpretation of the meaning of the law of 1880 is made necessary by the restrictive language of the title of the act, and that if the interpretation be that the amendment extends the powers of a corporation created by special act, then the law contravenes the provision of the constitution which declares that " every law shall embrace but one object and that shall be expressed in the title."

If the intention of the legislature was to give the interpolated words the meaning which the informant contends for, the method of expressing that intention was most unfortunate. It is observed that the power conferred consists of two parts, separated by a semi-colon; the first treats of the power to give a lease, and the second treats of the power to take a lease. Now the interpolated words are put in the first part so that the grammatical and natural meaning, and I think the only meaning of which the act is susceptible is, that power to lease is conferred upon the company incorporated by special act. If it had been intended to express the meaning that the informant contends for, the intention would accurately and easily have been effected by an interpolation in that part of the power which authorizes the taking of a lease. The meaning insisted upon is too forced to merit further discussion.

Passing to the consideration of the title of the act, I acquiesce
in the informant's insistment that the rule is established, that
where the meaning of a statute is doubtful the title may be re-
ferred to for assistance in its elucidation, because, under the con-
stitution, the object of the act must be expressed in its title, and
before a law shall be declared to be unconstitutional it will be
read in the light of its title to see if, within the fair bounds of
that title, a reasonable interpretation may be given to it.     That
rule is invoked here to excuse and support the meaning contended
for, but it is of no assistance.    The meaning of the body of the
act is not in doubt.    The meaning of the title is that which
counsel really questions.    It is "An act to amend an act entitled
'An act to authorize the formation of railroad corporations and
regulate the same.'"    The inquiry is, To what antecedent the words
"the same," in this title, relate?    To railroad corporations gen-
erally, or to those only which are formed under the act?    Does
the object it expresses contemplate the formation and regulation
of all railroads or the formation and regulation of those only
which may be organized under that law?    These questions sug-
gest ambiguity in the title of the law.    If we refer to the body
of the original act for an index to the legislative mind, we will
find that which I described in *Montclair* v. *New York and Green-
wood Lake Ry. Co., 18 Stew. Eq. 442*, in this language: "Through-
out the act the greatest care is taken, by express language pre-
facing certain of the sections, to confine the provisions of those
sections, to corporations formed under the act, but there are other
sections, which concern proper regulations applicable to any rail-
road, that are not so prefaced, and in terms refer to any railroad,
indicating that the legislative intent was to enact a general law
which should regulate all railroad corporations, and at the same
time authorize the formation of new ones.    Perhaps the most
striking indication of this intention is found in the last section
of the act (*Rev. p. 936 § 127*), where it is provided that the act
may be altered, amended or repealed, but such repeal or altera-
tion shall not affect any corporation *heretofore organized*, unless
the act making such repeal or alteration shall so expressly de-
clare.    It was evidently the legislative intent that the act should

extend to all railroad corporations of the state. Its several sections, however, are so drawn as to distinguish in their application between corporations organized under 'that act and all corporations, whether formed under that act or otherwise incorporated. This distinction was evidently the result of an extended consideration of corporate interests, for in the last section of the act, looking to the maintenance of the distinction, it is provided that when an amendment is intended to extend to corporations organized before the act was passed it shall so expressly declare."

In the case from which I have just quoted I found it to be impossible to reconcile the body of the act with a narrow construction of the title which would restrict the act's regulation of railroads to those companies which were formed under it. The object of the act appeared to be general provision for the organization and control of railroad corporations—the gathering of all, so far as could be constitutionally done, within one comprehensive, general law. That such has been the universally accepted signification of the law is evinced by its being known as the " General Railroad Law." That such has been the subsequent legislative construction of its object is shown by the frequent enactment of laws for the regulation of all railroads, however formed, entitled as supplements to the law discussed. And such construction has more than once, without being questioned, had judicial acceptance in this court. *Elkins* v. *Camden and Atlantic R. R. Co., 9 Stew. Eq, 11; Mills* v. *Central R. R. Co., 14 Stew. Eq. 4.* The title of the act in question may naturally be read to express the object of the law. It does express the object evinced in the body of the law, and does not necessarily restrict that body within narrower bounds than it assumes.

But does a law which purports to both form and regulate railroads embrace a single object?

The constitution requires that each law shall have a single object, and that that object shall be expressed in the title of the act. The language of the sentence in which this constitutional requirement is embodied is this:

" To avoid improper influence which may result from intermixing in one and the same act such things as have no proper relations to each other, every

law shall embrace but one object, and that shall be expressed in the title."
*Pl. 4 § 7 art. 4.*

The requirement is to be construed in the light of the expressed reason for it. The evil condemned, for which the remedy is prescribed, is not the uniting of properly related subjects in one act, but the uniting of subjects that are foreign to each other, and which do not all tend to the promotion of a single object. Various subsidary subjects, properly connected and relating to one comprehensive subject, may be united in the same law. The end aimed at is that each law shall have a single general object, which shall be stated in its title, and that all parts of the law shall be germane to that one subject. The purpose is that each distinct subject matter of legislation shall have independent consideration upon its merits, unaffected by the presence of foreign matter which may tend to distract, confuse, or improperly influence, and that the title shall conspicuously indicate the general object of the act, so that the intrusion of the irrelevant matter may be readily detected, and, if it shall remain in the law, be without effect, because inimical to the title. This is the accepted interpretation of this provision of our constitution in numerous decisions of our courts. *State* v. *Town of Union, 4 Vr. 350; Gifford* v. *New Jersey R. R. Co., 2 Stock. 172; State* v. *Newark, 5 Vr. 236; Rader* v. *Township of Union, 10 Vr. 509; S. C., 12 Vr. 621; Payne* v. *Mahon, 12 Vr. 292; State* v. *Hammer, 13 Vr. 438; Onderdunk* v. *Plainfield, 13 Vr. 480; Van Riper* v. *Plainfield, 14 Vr. 349; Snipe* v. *Shriner, 15 Vr. 206; New Brunswick* v. *Williamson, 15 Vr. 169; Bergen County Savings Bank* v. *Township of Union, 15 Vr. 599; Vail* v. *Easton and Amboy R. R. Co., 15 Vr. 237; Daubman* v. *Smith, 18 Vr. 200; Grover* v. *Trustees of Ocean Grove Association, 16 Vr. 399; Bumsted* v. *Govern, 18 Vr. 368; Dobbins* v. *Northampton, 21 Vr. 496; Easton and Amboy R. R. Co.* v. *Central R. R. Co., 22 Vr. 267; Kirkpatrick* v. *New Brunswick, 13 Stew. Eq. 46.*

The formation and regulation of railroads are subjects naturally and properly related to and connected with each other, and are both germane to the object, which is expressed by their being coupled in defining the title of the act; that is, as I have already

said, the creation of a general scheme which is capable of dealing with all railroad affairs which may be within the legislative power. We are not to say that the object of a law is not expressed in its title when the language of the title is an enumeration of the subjects it embraces. That very enumeration may serve to more clearly express the general object. For instance, in *Easton and Amboy R. R. Co.* v. *Central R. R. Co.*, *supra,* the title "An act to cede to the mayor and common council of Jersey City certain lands of the state, now and heretofore under the tide waters of the Communipaw bay, and to establish a tide-water basin adjacent thereto," was held by the supreme court to express, with even unnecessary precision, the single object of appropriating land owned by the state to public uses.

I do not find any constitutional infirmity in the title to the act in question, and the language of the act appears to me to be sufficiently broad and comprehensive to confer the power contended for by the defendants.

My conclusion upon questions arising in this case and hereafter stated obviates the necessity of my passing upon this proposition, which was most strenuously insisted upon by the attorney-general, that even though the act of 1880 may confer the power to lease, that power, impliedly, from the character of railroad corporations as *quasi* public bodies, is limited to leases designed for the public welfare, and does not warrant a lease in furtherance of a scheme to prevent competition and create a monopoly. While I do not declare this insistment to be law, and accept it as a factor in the process by which I reach the result of my deliberation, I deem it to be of such importance as to merit full statement.

Corporate bodies that engage in a public or *quasi* public occupation are created by the state upon the hypothesis that they will be a public benefit. They enjoy privileges that individuals cannot have. Perpetual or certain life is accorded to them. Usually the authority of the right of eminent domain is delegated to them, often to be exercised in whatever locality they may be pleased to designate. *National Docks &c. Ry. Co.* v. *Pennsylvania R. R. Co.*, *24 Vr. 217.* The use of the common highways is frequently

subordinated to their operations, and, indeed, the individual is compelled, even in his own home, to submit without redress to discomforts incident to their lawful operation which he would not be required to tolerate from other sources. *Beseman* v. *Pennsylvania R. R. Co., 21 Vr. 235; S. C. on appeal, 23 Vr. 221.* Thus they are given special privileges because of the benefits they are presumed to confer upon communities. Railways afford speedy and comfortable passage to and from divers parts of the country, carry produce of mines, farms and factories to markets, distribute industries throughout the land, feed the multitudes in populous cities, and accomplish many other beneficent ends. Water, gas, telegraph and similar corporations also render to the public benefits which readily suggest themselves to the mind as it contemplates their work. While the state confers special privileges upon these favorites, it at the same time exacts from them duties which also tend to the public welfare. The whole scheme of the laws of their organization is to equip and control them as instruments for the public good. Such corporations hold their powers not merely in trust for the pecuniary profit of their stockholders, but also in trust for the public weal. The impress for public good is stamped upon their very being, and it becomes a duty which, though not prescribed in express language of the law, is to be implied from the nature of every power conferred. When, therefore, it appears that such a corporation, unmindful of this plain duty, acts prejudicially to the public in order to make undue gains and profits for its stockholders, it uses its powers in a manner not contemplated by the law which confers them. The use becomes abuse, and is tantamount to excess of power.

I appreciate the strength of this argument, but, as I have said, I do not need to affirm it to justify my conclusions, and, therefore, content myself with the mere statement of it.

Anticipating that I might hold that the act of 1880 is constitutional, and that it gives power to the Central Railroad Company to lease its road and franchises, the attorney-general further urges—*first,* that the lease in question is in reality made to a foreign corporation; and, *second,* that such a lease is forbidden by the

Stockton *v.* Central R. R. Co.

statute approved May 2d, 1885, entitled " An act respecting the leasing of railroads," except under conditions which do not exist. . I agree with him in both these propositions.

Equity looks at the substance, not merely the outward form. The transaction of the 12th of January, 1892, between the three defendants consists, in form, of a lease between two of them, and a guarantee of that lease, coupled ·with a traffic agreement to which all three of them are parties. Such is the form. But when the fact that a law which, in its terms, prohibits a lease to a foreign corporation without legislative sanction is contemplated, and regard is had to the characters and relations of the contracting parties, and to the terms of the instruments they have entered into, and the simultaneous execution of those instruments, a substantial status differing from the form is disclosed. The statute forbade a lease to the Philadelphia and Reading Railroad Company, a foreign corporation, until a law should be enacted which would approve such a lease, but it did not prohibit a lease to a domestic corporation. The Philadelphia and Reading Railroad Company, through its officers and servants, had promoted the organization of the Port Reading Railroad Company under the General Railroad law of this state for the purpose of building and operating a short railway in connection with its system. The capital of that company is $2,000,000. The road is only twenty miles long. When the lease was made it was but partially constructed. Upon such assets as it then had there existed a mortgage for $1,500,000, an amount probably in excess of the value of those assets. No one can for a moment believe that the Central Railroad Company of New Jersey would commit its extensive railroad, with its depots, stations, terminals, rolling stock, ferries, and forty auxiliary roads, in all representing assets valued at nearly $70,000,000, to the keeping of so irresponsible a lessee, and depend upon it alone for the security of that property and the payment of a rental which, for a single year, will exceed the value of the lessee's entire property. The mere statement of such a proposition exhibits a business absurdity. The lessee was not only irresponsible under such a trust, but was not in position to afford the Central Railroad Company even a temporary benefit

from alliance with it. Without the sustaining arm of the Philadelphia and Reading company a lease to it would not have been thought of.

The recitals of the guarantee admit this absurdity by representing that the Central Railroad Company would not lease until the Philadelphia and Reading company, entering into the same transaction, and as a party thereto, executed the paper called the "guarantee." That paper expressly embodied the lease and bound the Philadelphia and Reading Railroad Company to the virtual execution of it. The lease, so called, with the Port Reading company was a mere form. The guarantee was the really operative and important paper. Without it the Central railroad would not be assured of its rental and the traffic that was necessary to make the proposed alliance profitable, for the Port Reading Railroad Company, as a distinct entity, was irresponsible and without power to assure traffic.

But more than this, the Port Reading Railroad Company is, for all substantial purposes, the Philadelphia and Reading Railroad Company. It is confessedly owned by individuals who represent and serve the Philadelphia and Reading. Its capital stock, save a few shares, has gone, or is to go, to a construction company which unquestionably belongs to the same interest. The construction company is officered by the servants of the Philadelphia and Reading Railroad Company. It has commenced work with an insignificant paid capital—$2,000—and it has confessedly drawn moneys from the Philadelphia and Reading railroad to enable it to build the Port Reading road. The business offices of both the Port Reading railroad and the Port Reading Construction Company are identical with the principal office of the Philadelphia and Reading Railroad Company. A glance at the execution of the guarantee exhibits that the same individuals are president and secretary of both the Port Reading Railroad Company and the Philadelphia and Reading Railroad Company. By official reports stockholders of the Philadelphia and Reading Railroad Company are informed that the Port Reading railroad is "*their*" road, and, in substance, that it is expected to earn an adequate return for "*their*" investment in it. In the face of

such a situation it is idle to say that the Port Reading Railroad
Company is not in all things, save in its intangible and unsub-
stantial corporate entity, the Philadelphia and Reading Railroad
Company. It is only necessary to state these particulars to satisfy
the mind of the justice of this conclusion. Says Mr. Morawetz
in his work on *Corporations, § 227:*

" The statement that a corporation is an artificial entity apart from its mem-
bers is merely a description in figurative language of a corporation viewed as a
collective body. A corporation is really an association of persons, and no judi-
cial dictum or legislative enactment can alter this fact."

" It is a certain rule," said Lord Mansfield in *Johnson* v. *Smith,
2 Burr. 962,* " that a fiction of law shall never be contradicted
so as to defeat the end for which it was invented, but for every
other purpose it may be contradicted."

It follows from the conclusion reached, that the intervention of
the Port Reading company as nominal lessee is but a device to
disguise the real nature of the transaction. It is demonstrated as
clearly as words could state it, that the object of the transaction
was to place the Central railroad within the Philadelphia and
Reading railroad system. The Central's reliance was not upon
the small unfinished road, with a comparatively petty capital and
little or no valuable assets, but upon the Philadelphia and Read-
ing Railroad Company that estimated its assets at $200,000,000.
It is sticking in the bark to say that in this transaction the Phila-
delphia and Reading Railroad Company is not the real lessee,
and that the guarantee executed by it is not the real lease. The
misnomer of papers and the use of a nominal entity as nominal
lessee does not change the substance of the transaction with which
this court deals. The situation here may be summed up in the
words of Vice-Chancellor Kindersley in *Attorney-General* v. *The
Great Northern Railway Co., 1 Drew. & S. 157, 6 Jur. (N. S.) 1006,
29 L. J. 794,* " a more flimsy device, when the particulars are
once known, it is impossible to imagine. It may succeed for a
time in baffling persons who may have an interest in preventing
its being done and has succeeded, but it was a mere crafty con-
trivance to evade the requisition of the law on the subject of joint
stock companies."

It must not be thought that courts are powerless to strip off disguises that are designed to thwart the purposes of the law. The mere suggestion of such a condition is an insult to the intelligence of the judiciary. Whenever such disguises are made apparent they can readily be disrobed. The difficulty is in showing the disguises, not in penetrating them when they appear. *Attorney-General* v. *The Great Northern Railway Co.*, *supra;* *Pennsylvania R. R. Co.* v. *Commonwealth*, *7 Atl. Rep. 268;* *People* v. *Chicago Gas Trust Co.*, *130 Ill. 268;* *People* v. *North River Sugar Refining Co.*, *121 N. Y. 582;* *State of Ohio, ex rel. Attorney-General* v. *Standard Oil Co.*, *30 N. E. Rep. 279.*

Now, what is the effect of the act of 1885?

It consists of three sections; the first forbids any railroad corporation to lease its road or franchises to any foreign corporation, or to unite, consolidate or merge its stock, property, franchises or road with those of a foreign corporation until the consent of the legislature of this state thereto shall have been obtained. The second prescribes how that consent of the legislature shall be obtained. The language is:

"It shall submit a draft of the proposed lease * * * to the legislature of this state, for its consideration, and no such lease * * * shall be of any effect whatever until the same shall have been approved by an act of the legislature passed for that purpose, nor until the corporation or corporations, person or persons, parties to such lease, * * * shall first and, as a condition precedent to the same, file in the office of the secretary of state an agreement to be approved by the governor and attorney-general, surrendering to the state all rights or exemption from taxation" &c.

The third section repeals inconsistent legislation. In short, the effect of the act is to withdraw the power to lease, given by the statute of 1880, so far as a lease to a foreign corporation is concerned.

The defendants attack this act by claiming that it contravenes two requirements of the constitution, contained in paragraph 11, section 7, article IV., one of which is that the legislature shall not pass any private or special law "granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever," and the other of which is, that "the legis-

lature shall pass no special act conferring corporate powers."
Their argument is, that the proposed lease is to be without va-
lidity until it shall be approved by an act of the legislature passed
for that purpose, and that as any lease, to be approved, will be
replete with conditions, covenants and terms which, in their very
nature, are special and inapplicable to any person, natural or
artificial, other than the contracting parties therein, any, even
general, act ratifying it, must confer a particularly limited power
and to some extent exclusive privilege, upon the corporate parties
to the lease.

If this argument should be applied to a law specially passed
to sanction a particular lease it might be regarded as sound, but
as no such law has been passed, it is obvious that its validity
cannot be discussed or determined. The law now considered, is
the act of 1885. That act does not confer either a power or a
privilege. Its object is to restrict or condition the exercise of an
existing power. The objection urged, then, properly should be,
that the law of 1885 cannot constitutionally be put in force
according to the legislative intent, and to sustain that objection it
must appear that an attempt to act under the law will, of neces-
sity, induce legislation that will be unconstitutional and therefore
void, and the argument will be that, as for that reason no action
under the law can be successful, the law is incapable of being
performed and therefore binds not.

It is to be observed, however, that the reference to a subsequent
legislature is couched in terms which manifestly contemplate a
lawful exercise of the lawmaking power. The action is to be by
" an act passed for that purpose." The statute attacked, then,
contemplates a law to be subsequently made by a power equal to
that from which it sprang. It cannot dictate the terms of such
subsequent law. When it prescribed that action should be by
law, it surrendered power over that action. I must assume that
the statute questioned was enacted in the light of this fundamental
principle, for the lawmakers are entitled to every presumption in
favor of their knowledge and wisdom. *Cooley Const. Lim. 219.*

Viewed in this light, the legislative purpose appears to have
been, not to inaugurate a permanently prohibitory policy con-

cerning leases to foreign corporations, but to forbid them until they should have legislative sanction. Having no power over subsequent legislation, the laws could not prescribe that that sanction shall be given in special terms, nor does it intend to so prescribe. Its purpose is to lead the proceeding for sanction to a point where its power must cease and there surrender it. It in effect prescribes that railroad corporations of this state shall not lease to foreign corporations without the sanction of law to be hereafter enacted; that it is not the policy of the law to permanently prohibit such a lease, but it does now prohibit it, and will prohibit it, until hereafter a law to be enacted shall permit it; until a future law shall, in the light of the terms desired, prescribe terms under which it may be made.

That such uncontrolled future law need not be special, is too plainly apparent to require discussion.

The law of 1885, then, is constitutional and is applicable to the lease now questioned. And it follows that the lease was made not only without legal sanction but in defiance of an expressly prohibitory statute.

The next inquiry is, whether the attorney-general may invoke the power of this court to restrain further operations under, and in pursuance of, the lease.

It is well settled that where a corporate excess of power tends to the public injury or to defeat public policy it may be restrained in equity at his suit. In *Attorney-General* v. *Delaware and Bound Brook R. R. Co., 12 C. E. Gr. 631, 633,* in pronouncing the opinion of the court of errors and appeals, Mr. Justice Dixon said: "In equity as in the law court, the attorney-general has the right, in cases where the property of the sovereign or the interests of the public are directly concerned, to institute suit by what may be called civil information for their protection. The state is not left without redress in its own courts, because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer, on whom it has cast the responsibility, and to whom, therefore, it has given the right of appearing in its behalf and invoking the judgment of the court on such questions of public moment."

Professor Pomeroy, in his work on *Equity Jurisprudence*, § *1093*, states the rule in this language:

"When the managing body are doing, or are about to do, an *ultra vires* act of such a nature as to produce public mischief, the attorney-general, as the representative of the public and of the government, may maintain an equitable suit for preventive relief."

It appears that the attorney-general has the election in his discretion whether, in cases of excess in corporate powers, he will proceed at law to forfeit the charter and franchises or apply in equity for a restraint of the excess. Both tribunals are open to him. The right of appeal to equity does not depend upon the inadequacy of the legal remedy. This subject is stated by Chief-Justice Ryan, in *Attorney-General* v. *Railroad Companies, 35 Wis. 524*, in this way: "The equitable jurisdiction precludes the objection that there is an adequate remedy at law. It admits the remedy at law, but administers its own remedy in preference, when the state seeks it in preference. It seems to proceed on the presumption that it may better serve the public interest to restrain a corporation than to permit it by penal remedies or to forfeit its charter; and that, on that view, the proper officers of the state should have an election of remedies. And we may as well say, in this connection, that the jurisdiction to entertain these informations is wholly independent of an adequate remedy at law; and that were that otherwise, we could not consider the informations in the nature of a *quo warranto*, pending in this court against these defendants, as an adequate remedy at law, which could be a substitute for or bar to the injunction asked. Judgments of ouster on those informations might not only be of far more grave consequence to the defendants, but might be far less beneficial to the state, and less accordant with its policy, and altogether less equitable and proper, than the injunction sought to restrain the defendants from doing what is alleged to work a forfeiture of their charters."

There has been some disagreement among the cases as to whether an injunction will issue at the instance of the attorney-general to restrain every excess of corporate power, or whether, before it issues, actual threatened injury must be manifest. The

argument which sustains the first class of such cases is that every excess of corporate power violates the contract with government, and thereby invades public and governmental rights. The law deems such invasion to be a public injury. An apt illustration is to be found in the case of *Thomas* v. *West Jersey R. R. Co.,* *101 U. S. 71,* where there was an unauthorized lease of a rail-road. The supreme court of the United States there held, that the franchises and powers granted to a railway company are de-signed to be exercised by it for the public good, and this purpose enters into the consideration for the grant. Any contract, there-fore, by which the corporation disables itself to perform those duties to the public, or attempts to absolve itself from their obli-gation, without the consent of the state, is a violation of its con-tract with the state and tends to the public injury.

The argument to sustain the other class of cases is that a court of equity should not move upon mere legal intendment, but should be satisfied of a real, substantial public injury which demands the writ of injunction in the due protection of the public. In the use, at least, of a preliminary injunction, the latter class of cases appears to be the better founded in fitness and reason, for if there be no present emergency to be met, why may not the in-junction be reserved until final hearing?

The authorities upon this subject are numerous. The follow-ing, among them, appear to me to best exhibit the the contrariety of opinion that I have stated: *Green's Brice's Ultra Vires (2d ed.) 708; Attorney-General* v. *Shrewsbury Bridge Co., 21 Ch. Div. 752; Attorney-General* v. *Cockermough Local Board, 18 Eq. Cas. 172; Attorney-General* v. *Great Eastern Ry. Co., 11 Ch. Div. 449; Attorney-General* v. *Great Northern Ry. Co., 1 Drew. & S. 184, 6 Jur. (N. S.) 1006; Attorney-General* v. *Railroads, 35 Wis. 525.* The last-cited case collects almost all the authority upon this subject.

But the exhibition of the tendency of the lease in question to public injury does not rest alone upon mere legal intendment, and I may here apply the rule, with the limitation incorporated in it, that the tendency to public injury must in fact appear.

There are peculiar features in the transaction now considered that evince a public danger much more serious than appears in the mere transfer of corporate duties to performance by a foreign corporation. The real lessor and lessee here are extensive producers and carriers of anthracite coal. They constitute two of the six great anthracite coal carriers from the coal regions of Pennsylvania to this and adjoining states. It is disclosed that the real lessee has secured a lease of the Lehigh Valley Railroad Company, and that thereby, and by the lease in question, it controls three of the six great coal carriers referred to and also that the alliance thus formed now controls, through the instrumentality of coal companies, the capital stock of which these combined carriers own, more than one-half of all the anthracite coal fields in Pennsylvania. Moreover, as an indication of the tendency of the combination, the attorney-general presents a report by the lessor defendant to its stockholders, in which it congratulates them upon an alliance which, with the co-operation of other large coal-producing companies, will insure them " greater uniformity in prices of coal " and the " avoidance of needless and expensive competition between producers." He urges that, in substance, this report declares the reaching out to a monopoly which will work inestimable disaster to the people of the state. And as a further evidence that monopoly is in view, he points also to an admission by the president of the Philadelphia and Reading Railroad Company that the lease complained of will possibly facilitate the co-operation of other coal producers and, in itself, undoubtedly affect prices of coal in some localities.

The proofs show that there are localities in this state which formerly had the advantage of competition between these allied roads but now are subject to the monopoly which this lease affords.

It is true co-operation of the remaining coal roads, which is necessary to a complete monopoly, has not yet been secured. By this lease only one competitor is silenced and only a little more than one-half of the entire coal region is controlled. It is only the second step in the direction of monopoly, the first being the lease of the Lehigh Valley railroad. It is to be remembered,

Stockton *v.* Central R. R. Co.

however, that the attorney-general may have his injunction when the *ultra vires* act tends or is of a nature to produce public injury. He is not required to wait until all the monopoly possible is created or until all the injury possible is in process of infliction. The present situation may be justly regarded as Vice-Chancellor Kindersley considered that which was presented to him in *Attorney-General* v. *Great Northern Ry. Co., 1 Drew. & S. 184, 6 Jur.* (*N. S.*) *1006,* where the *ultra vires* act was the mere dealing in coal by a railway company. He comments upon it as follows: " Mr. Rolt argued, well, but there is no danger of monopoly, because, even if you were to suppose that this company got the entire command of all the coal which comes down that line from the inland districts and the northern part of England, that is not monopoly ; there is all the coal that comes from the northwestern district, the Lancashire District, and all the coal from the Welsh District, Bristol Coal, and so on, and there is no monopoly. But follow that out, and suppose this company has got the command of all the coal on its line, and from that part of the country from which it starts, and suppose that the London and Northwestern has got the control of all the Lancashire and Northwestern coal. country, and suppose the Great Western has got the command of all the Welsh and Bristol coal fields, you have got, then, the whole traffic in coal which is to supply the metropolis and the country in the hands of three companies. Are not the interests of the public most deeply concerned in preventing that ? Is it not obvious that the interests of the public must suffer if that state of things is allowed to arise ? And yet what this company is doing may just as well be done by each of the other companies I have mentioned, and the result would be, in effect, not a monopoly of one company, but a monopoly of three, or four, or five companies, and a monopoly most prejudicial."

But the answers deny that either the Philadelphia and Reading company or the Central company own any coal lands, or produce or deal in coal. That is true, but at the same time it is admitted that the Philadelphia and Reading company owns a majority of the capital stock of the Reading Coal and Iron Company, and that the Central company owns the majority of the capital stock

·in the Lehigh and Wilkesbarre Coal Company, and that these two coal companies own or possess the coal land referred to as belonging to their owners. What is this but disguise and evasion? Whatever may be the nominal ownership or the legal title, for the substantial purposes of the injury apprehended and the attorney-general's complaint the railroad companies stand as the owners of the coal lands in this court. That the fiction which excuses the denials of the answers is mere form is emphasized by the language of the president of the Philadelphia and Reading company ·when, in one of his reports to its stockholders, he speaks of competitors, and adds:

." who, with yourselves, are engaged in producing *a commodity* far in excess of the demand of the markets, but the proportion of business allotted to this company in years past, when its financial straits and lack of facilities did not permit it to *mine* and distribute its proportion of the 'increased tonnage'" &c.

and when he refers to the Port Reading railway as supplying the means of putting the product of "your mines" upon the market, and when he reports to the same stockholders in this language:

"It will not do to expect immediate returns for *your large holdings of unproductive coal lands*. These in good time will reach a value equal to the entire capital debt of your company. But what is needed now is the practical development of so much of these lands as are needed to supply the demand for anthracite coal."

And also by the report of the president of the Central Railroad Company to its stockholders, to which I have already referred, in which he says: "It is fair to expect as the further result of this alliance, with the co-operation of *other large coal-producing companies,* greater uniformity in the price of coal" &c.

So also the testimony of the president of the Philadelphia and Reading company abounds in admissions of railroad ownership of the coal lands.

The answers are literally true, but their denials in this respect, without explanation, and in the face of the facts adverted to, savor of an evasion which disentitles them to that force which

is usually accorded to the denials of responsive answers upon such a preliminary hearing as this.

Here, then, we have great coal dealers, complaining that they are not sufficiently paid for the produce of their mines, combining, so that already they control more than one-half of the coal fields upon which this state depends for fuel, and looking to the co-operation of the remaining anthracite coal producers to effect a change in the price of their out-put, so that they may have more satisfactory returns from their investment. To say that these conditions do not tend to a disastrous monopoly in coal, would be an insult to intelligence. It is possible that such a monopoly may be used, as the defendants suggest, to introduce economies and cheapen coal, but it does violence to our knowledge of human nature to expect such a result. Upon such a possibility, I quote again the language of Vice-Chancellor Kindersley in the case of the Great Northern railway. He says: " It is said, well, but according to the statement of the bill and affidavits, so far from that being prejudicial to the public, it is most beneficial ; for see what is the result; coal is made cheaper ; yes, coal is made cheaper temporarily ; but are we to suppose that this company, or any company—for I confess I have no faith in the morality of any joint stock company—that this company, or any other company—especially this company, which has contrived such a cunning device to conceal its proceedings—will merely consider the interests of the public and supply the public with cheap coal ? What is the object of a joint stock company ? To make as much money as possible to divide among shareholders. The result, if this proceeding goes on, with this company and other companies, must be most grievously to the detriment of the public."

Treating this same suggestion, in State v. Standard Oil Co., 30 N. E. Rep. 279, Judge Marshall says: " It may be true that it has improved the quality and cheapened the cost of petroleum and its products to the consumer. But such is not one of the usual or general results of a monopoly ; and it is the policy of the law to regard not what may, but what usually happens. Experience shows that it is not wise to trust human cupidity where

it has the opportunity to aggrandize itself at the expense of others. The claim of having cheapened the price to the consumer is the usual pretext on which monopolies of this kind are defended, and is well answered in *Richards* v. *Buhl, 77 Mich. 632*. After commenting on the tendency of the combination known as the 'Diamond Match Company,' to prevent fair competition and to control prices, Champion, J., said: 'It is no answer to say that this monopoly has in fact reduced the price of friction matches. That policy may have been necessary to crush competition. The fact exists that it rests in the discretion of this company, at any time, to raise the price to an exhorbitant degree.'"

The commodity in which these companies deal is a necessary of life in this state. It is the principal fuel of its homes and factories. The slightest increase in its price is felt by a population of hundreds of thousands of persons, for their necessity compels them to pay that increase. If once a complete monopoly be established by the destruction of competition, whether that be through lease or by co-operation, the promoters of it and sharers in it may have whatever price their cupidity suggests. The disaster which will follow cannot be measured; it will permeate the entire community, furnaces, forges, factories and homes, leaving in its trail murmurs of discontent with a government which will tolerate it and all the other evil effects of oppression.

Enough has been said to exhibit that the *ultra vires* act complained of portends the greatest danger to the public welfare, and that the case is clearly one in which the attorney-general may, and should, ask the the assistance of this court.

My conclusions upon the points stated preclude the necessity of my passing upon many other matters that were discussed at the argument. Among them is the question whether the Central company has power to lease its forty and more auxiliary roads, many of which it holds by lease or the ownership of the majority of stock, and also the very important question as to the power of the Central company, under its charter and subsequent legislation, to invest its capital in coal lands or in the stock of a coal company; also questions presented in a wider discussion of the

subjects of monopolies, competition and restraint of trade than it has been necessary for me to venture upon. Perhaps the prayer of the information, and the motion for injunction thereon, should now justify an entrance upon the discussion of these latter topics; but, as I conceive that the relief I have concluded to afford at this time is all that the public necessity will demand until all the proofs may be regularly taken, and the case may be finally and more deliberately heard, I refrain from it.

It remains only to define the bounds of the injunction to which the attorney-general is now entitled.

This is a preliminary application heard upon information, answers and *ex parte* proofs. Its object is to do no more than to prevent a threatened, irreparable injury until the cause can be finally heard, and it should go no further in disturbance of the existing situation than the effectual prevention of the injury apprehended will admit.

But the danger is serious. I do not perceive how I can effectually prevent it in any other way than by forbidding all operations under the lease and tripartite agreement, and performance of the covenants that those instruments contain. To merely continue the stay that has been granted and leave the Philadelphia and Reading Railroad Company in possession and operation of the property and franchises of the Central company, would be to facilitate and invite infraction of the order already made. The devices for disguise which have appeared in this case, as attributable to the defendants, admonish me to sever, as far as possible, the connection between them until the final hearing. I will, therefore, continue the present injunction to final hearing, adding to it, however, the further direction that the defendants, and each of them, their officers and agents, do desist and refrain from further performing and carrying into effect the lease and tripartite agreement, and that the Port Reading Railroad Company and the Philadelphia and Reading Railroad Company do desist and refrain from continuing to control the road, property and franchises of the Central Railroad Company of New Jersey, and from further in anywise intermeddling therewith, and that the Central Railroad Company of New Jersey do desist and re-

frain from permitting the Port Reading Railroad Company or the
Philadelphia and Reading Railroad Company to use, control or
operate its road, property and franchises, and that the Central
Railroad Company do again resume control of all its property
and franchises and the performance of all its corporate duties.